Eli Roy Lowenthal v. Commissioner. Sol G. Cogan v. Commissioner. William Shapiro v. Commissioner.
Lowenthal v. Commissioner
Docket Nos. 9749, 9751, 9758.
United States Tax Court
1947 Tax Ct. Memo LEXIS 343; 6 T.C.M. (CCH) 678; T.C.M. (RIA) 47169; 1947
*343 Max Bloomstein, Jr., Esq., 11 S. La Salle St., Chicago 3, Ill., Gilbert H. Hennessey, Jr., Esq., and John D. Filson, C.P.A., for the petitioners. Richard L. Greene, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings were brought for a redetermination of deficiencies in petitioners' income tax for the years 1940 and 1941 as follows: 1940
1941
Ell Roy Lowenthal
$1,298.43
$4,804.93
Sol G. Cogan
2,154.12
5,066.37
William Shapiro
1,618.79
5,558.76
Minor adjustments in 1940 income tax liabilities for petitioners Lowenthal and Shapiro made in the notices of deficiency are conceded by the respective petitioners. The sole disputed question is whether amounts received by petitioners in 1940 and 1941 from the Manheimer Watch Company constituted dividends under Internal Revenue Code, section 115. The parties filed stipulations of facts. The facts hereinafter recited are from the stipulations or are facts found from the evidence adduced at the hearing. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners Sol G. Cogan and Eli Roy Lowenthal are residents of Chicago, Illinois, and *344 petitioner William Shapiro is a resident of Los Angeles, California. Cogan and Lowenthal filed their individual income tax returns for the years 1940 and 1941 with the collector of internal revenue for the first district of Illinois, and Shapiro filed his individual income tax returns for 1940 and 1941 with the collector of internal revenue at Los Angeles, California. Prior to February 29, 1940, Cogan was executive vice-president of the Manheimer Watch Company, sometimes herein referred to as the Company. Thereafter and during the taxable years Cogan was president of the Company, and Lowenthal and Shapiro were vice-presidents. They were the sole directors. Shapiro also served as western sales manager. Petitioners at the present time are the officers and sole stockholders of the Company. Manheimer Watch Company was incorporated under the laws of Illinois on December 17, 1927. During the period here material it was engaged in the business of distributing American manufactured watches under franchises from the Hamilton, Elgin, and Waltham watch companies. The Company had succeeded to a business of similar nature established in 1875 by the Manheimer family. The Company was well established *345 and had an outstanding reputation. In 1939 the Waltham line accounted for approximately $350,000 of the Company's total business. In the spring of that year Waltham changed its method of distribution in a manner which led the officers of the Company to believe that it would lose 80 to 85 percent of the volume of its Waltham business. To offset this, the Company organized the Hampden Watch Company, an Illinois corporation, as a wholly-owned subsidiary, on May 6, 1939. Hampden was to import Swiss watch movements, obtain cases and straps, and sell these watches to customers they expected to lose as a result of the change in Waltham merchandising policy. This action was characterized by the parties as "sub rosa" due to the attitude of American watch manufacturers toward competition by foreign products. In the summer and fall of 1939 it developed that the Company would be in danger of losing its franchise for Waltham watches should its connection with Hampden and its activities be discovered. Arthur Manheimer decided he would take the business represented by Hampden. The authorized capital of the Company on December 31, 1939, consisted of 500 shares of preferred stock of a par value *346 of $100 per share, and 1,500 shares of common stock of a par value of $100 per share. On February 5, 1940, the 1,295.5 shares of outstanding common stock of the Company were owned as follows: No. of
Stockholders
Shares
Per Cent
Arthur E. Manheimer
725
55.963
Abraham Greenspahn and Al-
bert K. Orschel as Trustees
of the Manheimer Trust*
150
11.579
William Shapiro
188
14.512
Sol G. Cogan
110
8.491
E. Roy Lowenthal
105.5
8.143
Maurice Zimbler
17
1.312
1295.5
100.00
On February 5, 1940, Manheimer and the trustees transferred a total of 219 shares of the common stock to the Company, Manheimer transferring 183, and the trustees 36 shares. They received as consideration 250 shares, being all the stock of the Hampden Watch Company, a subsidiary wholly owned by the Company and the assignment of a $10,000 note of Hampden payable to the Company March 19, 1940. On February 6, 1940, petitioners purchased the remaining 656 shares owned by Manheimer and the trustees for $155.40 per share or a total of $103,962.40. These 656 shares were delivered to the Company *347 for transfer and new certificates were issued under date of February 6, 1940, as follows: Certificate
Number of Shares Issued to
Number
Shapiro
Cogan
Lowenthal
62
102
63
143
64
80
65
143
66
45
67
143
Total
245
223
188
Pursuant to an agreement dated February 6, 1940, Shapiro sold Cogan 20 shares of common stock of the Company and sold Lowenthal 60 shares of such stock. After this transaction the common stock of the Company was held as follows: Shares
Percent
Cogan
353
32.8
Shapiro
353
32.8
Lowenthal
353.5
32.8
Zimbler
17
1.6
Zimbler was an employee and not an officer or director. Under the contract of sale executed February 6, 1940, petitioners were obligated to pay the sellers $36,000 in cash on or before February 29, 1940, and the balance, plus interest, on or before January 15, 1941. Petitioners paid Manheimer and the trustees in February, 1940, the $36,000 in cash from their own funds but were unable individually to raise the necessary money to pay the balance due under the contract. To pay the balance due to Manheimer and the trustees, petitioners withdrew $66,365.06 from the Company as follows: May
October
March
7, 1940
25, 1940
11, 1941
Lowenthal
$ 4,500
$ 5,500
$12,492.45
Cogan
5,000
5,000
11,862.92
Shapiro
5,500
4,500
12,009.69
$15,000
$15,000
$36,365.06
*348 The amounts withdrawn were debited on the dates of withdrawal to the respective drawing account of each petitioner on the corporate books. Petitioners did not execute any notes to the Company in connection with the withdrawals nor did they furnish any security nor pay any interest. No formal corporate action authorized the withdrawals. On October 25, 1940, petitioners surrendered certificates numbered 62, 64, and 67, then held by them as follows: Certificate
Shares
Number
Shapiro
Cogan
Lowenthal
62
102
64
80
67
143
And they caused substitute new certificates to be issued to them respectively as follows: Certificate
Shares
Number
Shapiro
Cogan
Lowenthal
68
68
69
34
70
68
71
75
72
68
73
12
Total
102
80
143
On December 27, 1940, the Company acquired 68 shares of common stock from each petitioner, or a total of 204 shares, at $155.40 per share, or $10,567.20 for each petitioner. This aggregated $31,701.60 for the 204 shares. Stock certificates Nos. 68, 70, and 72 were delivered by petitioners to the Company which canceled them at that time. Certificate No. 74 for 204 shares was issued in the name of the Company and *349 carried on its books as treasury stock until August, 1942. On April 17, 1941, the Company acquired 76 shares of common stock from Shapiro and Cogan, and 76.5 shares from Lowenthal at $155.40 per share, being $11,810.40 for Shapiro and Cogan, respectively, and $11,888.10 for Lowenthal, or an aggregate of $35,508.90. Stock certificates were delivered by petitioners to the Company which canceled them at this time. Petitioners surrendered the following certificates to the Company: Certificate
Shares
Number
Shapiro
Cogan
Lowenthal
63
143
69
34
65
143
66
45
71
75
Total
177
143
120 And new certificates were issued as follows: Shares
Certificate
Low-
Number
Shapiro
Cogan
enthal
The Co.
75
20
76
60
77
76
78
21
79
76
80
67
81
76 1/2
82
43 1/2
Total
21
87
103 1/2
228 1/2
After the stock was acquired by the Company on April 17, 1941, its records showed its outstanding common stock was held as follows: Stockholders
No. of Shares
Percent
Cogan
209
32.45
Shapiro
209
32.45
Lowenthal
209
32.45
Zimbler
17
2.64
There were also the 651.5 shares of common stock issued in the *350 name of the Company and carried on its books as treasury stock. The surrender of the stock certificates to the Company on December 27, 1940, and April 17, 1941, was handled informally. Petitioners decided when the Company was in funds, and then withdrew the necessary amounts to pay Manheimer and the trustees. At the time the withdrawals were made on May 7, 1940, October 25, 1940, and March 11, 1941, petitioners did not expect to make cash repayments of the amounts withdrawn, but intended to have the debit balances in their respective drawing accounts eliminated by credits for appropriate amounts of stock which would be surrendered to the Company. The amounts which were distributed to petitioners by the Company on December 27, 1940, and April 17, 1941, on which dates they delivered their stock to the Company, were based on their cost of $155.40 per share, and not upon the book value of the stock. The debit balances in petitioners' respective drawing accounts prior to December 27, 1940, and prior to April 17, 1941, resulting from the withdrawals, were eliminated by the credits to the drawing accounts on December 27, 1940, and April 17, 1941, to give effect to the acquisition of *351 petitioners' stock by the Company on those dates. The amounts of those credits received on December 27, 1940, and April 17, 1941, were substantially the same as the amounts of the previous withdrawals, and were calculated to wipe out the debit balances arising from the withdrawals. There was no intent to liquidate the Company at the time petitioners' stock was acquired on December 27, 1940, and April 17, 1941. The business of the Company was not liquidated thereafter and the Company is operating at the present time. The stock acquired by the Company from petitioners on December 27, 1940, and April 17, 1941, was carried as treasury stock until August, 1942, and never resold. Cogan regarded the stock as retired as of the time the payments were received from the Company, and the corporate returns for the fiscal years ended February 28, 1941, and February 28, 1942, which were executed by Cogan as president of the Company, did not reflect the reacquired stock as an asset or a liability of the Company. The corporate returns for those years reflected the common stock on its balance as reduced by the par value of the stock acquired from petitioners in 1940 and 1941. On the balance sheets *352 contained in the audit reports of the Company for the years ended February 28, 1941, and February 28, 1942, the reacquired stock was not carried as an asset, but was deducted from the issued stock so that only the net amount was reflected on the liability side of the account sheet, the amounts of the outstanding common stock being set forth on the balance sheets as follows: Feb. 29, 1940
1,076 1/2 shares or $107,650
Feb. 28, 1941
872 1/2 shares or $87,250
Feb. 28, 1942
644 shares or $64,400
The 204 shares acquired by the Company from petitioners on December 27, 1940, and the 228 1/2 shares acquired on April 17, 1941, were acquired for retirement. The board of directors of the Company, at a meeting on August 21, 1942, noted that the 657.7 shares of common stock in the corporate treasury had never been cancelled, and that the stated capital was in reality $64,400. A resolution was passed on that date formally reducing the stated capital to that amount in order to reconcile the corporate records and to reflect the true situation. A similar resolution was adopted by the stockholders of the Company on August 22, 1942. The accumulated earnings and profits of the Company, accumulated *353 subsequent to March 1, 1913, according to the books of the Company, at the close of the fiscal years ended February 29, 1940, February 28, 1941, and February 28, 1942, were in the amounts of $61,325.22, $73,479.53, and $84,858.94, respectively. These amounts give effect to and take into account the debits to earned surplus in the amount of $11,301.60 and $12,658.90 with respect to the stock acquired by the Company from petitioners on December 27, 1940, and April 17, 1941, respectively, and a debit to earned surplus in the amount of $11,736.21 with respect to the stock acquired by the Company from Manheimer and the trustees on February 5, 1940. The earnings and profits of the Company for the years ended February 29, 1940, February 28, 1941, and February 28, 1942, were in the amounts of $33,079.41, $26,259.28, and $26,967.62, respectively. The following is a schedule of net income, dividends, and accumulated earnings and profits of the Company: Net Income
Accumulated
Earn-
Year
(per returns or
Dividends
ings or Profits (at
(calendar
as corrected by
Common
Preferred
close of year)
or fiscal)
Revenue Agent)
Stock
Stock
Per Books
1934
$16,221.21
$12,500.00
$ 536.25
$17,204.67
1935
28,985.45
8,640.00
1,950.00
30,478.27
1936
3,432.74
31,612.69
1937
29,347.43
15,966.80 *
2,085.00
36,696.01
1938
29,861.09
12,050.00
2,130.00
47,553.03
1939
10,228.86
12,790.00
1,810.50
41,572.38
1940
41,137.04
2,049.00
61,325.22 **
1941
33,724.81
1,500.00
73,479.53 ***
1942
41,023.43
1,500.00
84,858.94 ****
*354 The gross sales and the net sales of the Company for the period from March 1, 1939, to February 28, 1942, inclusive, were as follows: Fiscal Year Ended
Gross Sales
Net Sales
February 29, 1940
$901,194.29
$865,851.92
February 28, 1941
878,842.36
840,561.14
February 28, 1942
981,947.64
962,279.46
During the fiscal years ended February 28, 1941, and February 28, 1942, the principal sales of the Company were of Elgin and Hamilton watches. The sales by the Company of Elgin and Hamilton watches increased during the period from February 28, 1939, to February 28, 1942, as follows: Elgin
Hamilton
Fiscal Year Ended
Watch Sales
Watch Sales
February 29, 1940
$409,350.37
$149,119.85
February 28, 1941
563,805.09
193,797.98
February 28, 1942
600,044.13
244,043.84
*355 The Company had cash on hand and in banks during the fiscal years ended February 28, 1939, February 29, 1940, February 28, 1941, and February 28, 1942, in the amounts of $47,726.87, $25,953.93, $35,597.86, and $55,910.51, respectively. For the fiscal years ended February 29, 1940, February 28, 1941, and February 28, 1942, the working capital (net current assets) of the Company was in the amounts of $187,909.90, $193,866.99, and $181,651.52, respectively. There were no bonds outstanding during those years and no bank loans outstanding at the close of the years except for a $15,000 loan which was paid off during the fiscal year ended February 28, 1941. A $50,000 bank loan was paid off between February 28, 1939, and February 29, 1940. Petitioners did not report in their individual income tax returns for the taxable years 1940 and 1941 the transactions involved herein. Respondent determined in the notice of deficiency that each petitioner realized additional income in the foregoing amounts of $10,567.20 in 1940 and $11,810.40 as to Cogan and Shapiro and $11,888.10 as to Lowenthal in 1941, as dividends, and held that the distributions to each petitioner in 1940 and 1941 from the Company *356 in redemption and cancellation of its shares of stock was at such time and in such manner as to make the distribution and cancellation or redemption essentially equivalent to the distribution of a taxable dividend under the provisions of section 115 (g) of the Internal Revenue Code. Petitioners realized additional income during 1940 and 1941 as determined by respondent. The distributions in 1940 and 1941 from the Company were distributions in redemption and cancellation of its stock at such time and in such manner as to make them substantially equivalent to the distribution of a taxable dividend within the meaning of Internal Revenue Code, section 115 (g). Opinion The distributions in question are taxable dividends to petitioners, if the Company canceled and redeemed its stock at such a time and in such a manner that there was a substantial equivalence to the declaration of a dividend. Internal Revenue Code, section 115 (g). No serious argument can now be advanced that that section is without application because the cash distributions were loans which were later canceled ( A. E. Levit, 43 B.T.A. 1077), or because the original issuance of the stock *357 redeemed was bona fide ( A. E. Levit, supra; and see Kirschenbaum v. Commissioner (C.C.A., 2nd Cir.), 155 Fed. (2d) 33, certiorari denied, 329 U.S. 726 (October 14, 1946)), or because there was no corresponding reduction in the Company's surplus account ( Pullman, Inc., 8 T.C. 292), or because the redeemed stock became and was temporarily retained as "treasury stock." ( J. Natwick, 36 B.T.A. 866). Petitioners, however, attempt to present the facts as though the entire transaction was one in which they acted solely for the Company, the stock having been redeemed, in effect, not from them but from the retiring stockholder. We have omitted any such statement from our findings. Decision on a motion by respondent to strike this evidence was reserved at the hearing. The pleadings make no suggestion that petitioners were acting for the Company, and their tenor is that petitioners were acting only for themselves. There were no motions to amend. Rule 17, Rules of Practice Before The Tax Court of the United States; - see Louis Halle, 7 T.C. 245, 248. *358 As to so much of petitioners' evidence as tends to show that they were acting other than as principals, respondent's motion to strike is accordingly granted. With the testimony striken, the basis for the applicable finding disappears. We are not, however, required to reach our conclusion purely on the basis of a technicality in the pleadings. The record, particularly in its undisputed phases, persuades us that the transaction was more accurately described by the original petition than by the present version of fact and inference to which petitioners would lead us. Although they now say that the sale was not made directly to the Company because of its lack of ready funds, the fact is that the Company itself was the source of the payments which were made. Whether the cash used by petitioners to buy the stock be thought of as advances or dividends, it came in the first instance from the Company and was never returned to it. Likewise the liability for future payments, which petitioners now claim would have damaged the Company's credit, was on their own present version of the facts as real and subsisting as though it had been undertaken by a formal agreement. Either there was, as petitioners *359 contend, an unconditional commitment that the Company was to buy the stock or there was not. If there was, the asserted object of the arrangement could not have been achieved since the Company's creditors were equally entitled to that information whether the obligation ran to petitioners or to the retiring stockholder. If no such commitment existed, the subsequent transfer to the corporation was a voluntary and independent transaction undertaken apart from the original arrangement and free of any compulsion from it. We are accordingly unable to make the factual determination that petitioners were acting for the Company when they acquired the stock or that the Company's payments to them were the mere effectuation of an original agreement leading ultimately to that result. In that posture, the proceeding reduces to the question whether under the remaining circumstances the effect and consequence of the transfer by petitioners of pro rata portions of their stock to the Company in exchange for similarly proportional payments is of that essential equivalence to the declaration of a taxable dividend which section 115 (g) describes. An affirmative answer seems to us to be required. Petitioners *360 received without restriction virtually equal amounts of the Company's cash. They parted, in return, with nothing which changed their relationship to each other or to the Company. Cf. Eisner v. Macomber, 252 U.S. 189. Although it is true that the cash position of petitioners would have been reduced by purchase of the stock from the retiring stockholder had it not been replenished by the payments from the Company, they would yet have held in substitution for their cash an interest in the Company which they had never previously owned. The upshot of the payment to them by the Company was thus to leave to them the ownership of the entire corporate stock while at the same time maintaining their cash assets without diminution. Precisely the same situation would have resulted from the avowed declaration of a dividend equal to their cash outlay. Perhaps most significant of all, the dividend history of the Company so far as it appears confirms treatment of these distributions as tantamount to dividends. In the period from 1934 through 1939, the Company's earnings were nearly identical with those for the three fiscal years 1940 through 1942 with which we are *361 here concerned. Yet during the former span dividends of almost $60,000 were paid, whereas during the instant years no payments whatever were made as dividends. [1] The amounts received by petitioners, not greatly in excess of the dividends paid during the preceding period, purported to be in consideration of the surrender of the stock, but they would actually have exhausted a scarcely larger proportion of the accumulated current earnings of the Company than the true dividends paid during the Company's prior history. We conclude that in all material respects the statutory test is met by the circumstances shown in the present record and that the distributions in question were made in such time and manner as to be the essential equivalent of taxable dividends. *362 The distinctions from the case of Fox v. Harrison (D.C., N.D., Ill.), 32 A.F.T.R. 1651, affirmed (C.C.A., 7th Cir.), 145 Fed. (2d) 521, will already have become apparent. There can be no finding here, as there was there, that "the said arrangement provided that all of the stock * * * was to be acquired by the said corporation as and when it should be legally and financially able to do so, and that to the extent that it could not do so temporarily, the [taxpayer] should buy and hold such stock until the corporation could acquire it * * *." The present corporation, unlike that in the Fox case, had ample cash and, in addition, apparently adequate credit. And if the Company had paid its customary dividends during the period in question, petitioners would have been supplied with funds almost the equivalent of those they used in the purchase. We are accordingly convinced that Fox v. Harrison is not controlling in the present proceeding. Decision will be entered for the respondent. Footnotes
*. A trust created December 22, 1939, by Arthur E. Manheimer for the benefit of his wife and children.↩
*. $10,000 of which was paid in stock per option. ↩
**. After debit of $11,736.21 in connection with 219 shares of common stock acquired from Manheimer and the trustees on February 5, 1940. ↩
***. After debit of $11,301.60 in connection with 204 shares of common stock acquired from petitioners on December 27, 1940. ↩
****. After debit of $12,658.90 in connection with 228 1/2 shares of common stock acquired from petitioners on April 17, 1941.↩
1. The explanation appearing in petitioner's reply brief is: "* * * No dividends were paid during the fiscal years 1940, 1941 and 1942 because of the necessity of using available cash to discharge the understanding with Manheimer and the Trustees." Not only was there no "understanding" on petitioners' version of the facts between the Company and "Manheimer and the Trustees," but the latter would manifestly have had no concern with whether the cash they received came to them indirectly from dividends or from stock redemption.↩